# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| NORTHERN NEW ENGLAND TELEPHONE OPERATIONS LLC, | ) ) ) |
| Plaintiff, | ) ) ) Docket no. 1:12-cv-185-GZS |
| v. | ) ) |
| LOCAL 2327, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, | ) ) ) ) |
| Defendant. | |

## ORDER ON CROSS MOTIONS FOR JUDGMENT ON THE PLEADINGS

Before the Court are cross-motions for judgment on the pleadings filed by Northern New England Telephone Operations LLC ("Fairpoint") (ECF No. 17) and by Local 2327, International Brotherhood of Electrical Workers, AFL-CIO (the "Union") (ECF No. 14). Respectively, these motions argue that the March 23, 2012 Arbitration Decision and Award in favor of the Union (ECF No. 16-6), should be vacated or confirmed by this Court. As explained below, the Court DENIES Fairpoint's Motion (ECF No. 17). The Court GRANTS the Union's Motion For Judgment On The Pleadings but DENIES the Union's Motion For Attorneys' Fees And Costs (ECF No. 14).[1]

## I.   STANDARD OF REVIEW

The First Circuit has previously described challenges to an arbitration award in the labor-management context as "a steep uphill climb." Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005). As the First Circuit has explained and the parties before the Court both acknowledge:

---

[1] In accordance with District of Maine Local Rule 7(f), the Court has determined that this matter can be decided without oral argument, and thus DENIES the Motion For Oral Argument (ECF No. 20).

> [J]udicial review of an arbitration decision is extremely narrow and extraordinarily deferential. A court cannot vacate an arbitral award as long as the arbitrator is even arguably construing the contract and acting within the scope of his authority. In the end, the court's task is limited to determining if the arbitrator's interpretation of the contract is in any way plausible.

Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16, 20 (1st Cir. 2001) (internal citations and quotations omitted). Further, "as a general proposition, an arbitrator's factual findings are not open to judicial challenge. Even if the arbitrator was seriously mistaken about some of the facts, his award must stand." El Dorado Technical Servs., Inc. v. Union Gen. De Trabajadores De Puerto Rico, 961 F.2d 317, 320 (1st Cir. 1992).

Nonetheless, "an arbitrator's decision is not entirely impervious to judicial oversight." Salem Hosp. v. Mass. Nurses Ass'n, 449 F.3d 234, 238 (1st Cir. 2006). The First Circuit has held that "a court may review and set aside an arbitrator's decision only if the decision was: (1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact." Local 1445, United Food & Commercial Workers Int'l Union, AFL-CIO v. Stop & Shop Cos., Inc., 776 F.2d 19, 21 (1st Cir. 1985) (citing Bettencourt v. Boston Edison Co., 560 F.2d 1045, 1050 (1st Cir. 1977)). However, an arbitration award must be confirmed, if it "rests on a plausible interpretation of the underlying contract." Salem Hosp., 449 F.3d at 238.

Before proceeding to apply this deferential standard of review to the pending motions, the Court pauses to note the limited record presented. The parties have both filed motions for judgment on the pleadings that reference only the pleadings, the Collective Bargaining Agreement (ECF No. 16-1–16-5) (the "CBA"), and the arbitral Decision And Award (ECF No. 16-6) (the "Arbitration Award"). Neither party suggests that the Court needs additional material

to decide the motions before it. In light of this limited record, the Court's ability to review any factual conclusions of the Arbitration Panel is limited. See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union, Local 1-9, AFL-CIO, CLC v. S.D. Warren Co., 382 F. Supp. 2d 130, 139-41 (D. Me. 2005). Nonetheless, the record before the Court is sufficient to allow for review of the plausibility of the Arbitration Panel's contract interpretation.

## II. BACKGROUND

For purposes of the pending motion, the Court provides only a brief sketch of the relevant facts.[2]

On April 1, 2008, Fairpoint purchased Verizon's telecommunications operations in Vermont, New Hampshire and Maine. As part of the transaction, Fairpoint hired all of the employees formerly employed by Verizon and represented by the Union in those states. Around the same time as the purchase, in early 2008, the Union and Fairpoint renegotiated multiple provisions of the collective bargaining agreement, including a "Transfer of Jobs" provision. Both the Union and Fairpoint presented proposals for the Transfer of Jobs provision. Ultimately, the parties agreed to the Union's proposal, which stated, in relevant part:

> A.      Limitations on Transfer of Jobs
>
> The following limitations on permanent transfers of jobs shall be effective April 1, 2008 [i.e., the effective date of the Agreement] and shall terminate concurrently with the labor agreements, August 3, 2013.
>
> > 1) During each contract year of the parties' current collective bargaining agreements ("CBA"), from August 3, 2008 to August 3, 2013, the company may not permanently transfer IBEW

---

[2] In accord with Mercy Hospital, Inc., the Court defers to the Arbitration Panel's findings of fact. 429 F.3d at 344 (stating that "[w]ith a few limited exceptions not relevant here, an inquiring court is bound by an arbitrator's findings of fact."). Fairpoint has given the Court no basis to question the facts as found by the Arbitration Panel, and the Union urges the Court to follow the facts as found by the Arbitration Panel.

>   represented jobs to any entity which is not a signatory to this Agreement.
>
>   B. This Agreement does not limit or restrict Employee Transfer Plans.

The present dispute concerns the Wholesale Group, which sells services and access to Fairpoint's infrastructure to smaller telecommunications companies that compete with Fairpoint in the local market. Service representatives in the Wholesale Group process two types of orders: Access Service Requests (ASR), which are more complex, and Local Service Requests (LSR), which are simpler. While most LSRs are simple and capable of being handled by computers, a portion of LSRs orders are more complex and require attention by a service representative. Before the April 2008 purchase, Verizon had a computerized "flowthrough" system that sorted between those LSRs that could be handled by a computer and those that required a service representative. Approximately 94% of Verizon's LSRs were handled by a computer.

As part of the 2008 transaction, Verizon and Fairpoint entered into a Transaction Services Agreement (TSA). Under the TSA, Fairpoint anticipated using Verizon's employees and systems to ensure continuity of services until Fairpoint brought its own systems online. The TSA was in effect for several months past the closing, until February 1, 2009 (the "cutover" date). On the cutover date, the expectation was that all operations would be transferred to Fairpoint.

Fairpoint anticipated using the transition period to upgrade its computer systems so that they could match Verizon's 94% flowthrough rate. Accordingly, Fairpoint planned to have the Union service representatives in Portland, Maine handle the LSR fallout work (LSR orders that did not flowthrough to the computers).[3] A staffing model was created based on this premise,

---

[3] Under Verizon's ownership, the service representatives in the Union did not perform any Wholesale work. Rather, service representatives in other IBEW locals in New York and Massachusetts performed all of the ASR and the complex LSR work.

4

which projected that Fairpoint would need 25 service representatives to handle the LSR fallout work. No subcontracting was contemplated by Fairpoint at that time. In late 2007 and early 2008, Fairpoint and Verizon began redeploying the northern New England Wholesale work from Massachusetts and New York to the Portland, Maine service center.

As the cutover date approached, Fairpoint experienced problems. First, Fairpoint planned a ten-day "blackout" period during which Fairpoint changed from Verizon's computer systems to its own. During that period, the employees would have no access to computers and would be forced to take all orders by hand, creating a substantial back-log. Second, it became apparent that Fairpoint was not going to be able to match Verizon's 94% flowthrough rate by the cutover date. Instead, Fairpoint's systems were at an approximately 60% flowthrough rate, meaning that Fairpoint would need additional service staff to handle the unanticipated 40% fallout. Over the course of several months, Fairpoint representatives and Union representatives met to discuss the need for an additional work force. During those conversations, it was communicated to the Union that Fairpoint planned to hire a supplementary workforce through a company called TeleTech in Canada. Fairpoint communicated that this supplementary workforce would be temporary.

In approximately February 2009, Fairpoint divided the LSR work between Portland and Teletech. In general, Teletech handled the simple LSR work while Portland handled the complex LSR work. Under certain circumstances, however, Portland representatives did handle some simple LSR work. For example, Portland representatives would handle all LSR work for a given customer, whether simple or complex, and would assist Teletech representatives with questions. Despite Fairpoint's assurances that the transfer of work to the supplementary workforce would be temporary, the simple LSR work never returned to Portland. In August or

September 2010, Fairpoint switched the supplementary workforce from Teletech in Canada to APAC in Utica, New York.

Since the cutover date, Fairpoint had increased its flowthrough rate to 79%. At the cutover, the company used 95 employees at Teletech to process simple LSR orders. As of the date of the arbitration hearing, Fairpoint had decreased the number of those contract employees to 30. During the same period of time, the number of Union employees in the Portland Wholesale Service unit increased from 25 (15 LSR and 10 ASR) to 44 (29 LSR and 15 ASR).

After Fairpoint moved the LSR work to APAC in Utica, New York, the Union grieved the matter, alleging that Fairpoint had violated the Transfer of Jobs provision. The grievance was heard in arbitration pursuant to Article G9 of the CBA by a Board of Arbitration (the "Arbitration Panel"). The parties stipulated that the following issue be determined by the Board of Arbitration:

> Did the Company [Fairpoint] violate Exhibit G5 [the Transfer of Jobs provision] of the April 1, 2008 collective bargaining agreement with regard to wholesale work being performed by employees of Teletech or APAC? If so, what shall be the remedy?

(Arbitration Award at 1.) The Board of Arbitration ultimately found that Fairpoint had violated the CBA and explained:

> To summarize, the 2008 MOA prohibited the Company from permanently transferring jobs from the bargaining unit in Portland represented by IBEW Local 2327 to Teletech and APAC, which are outside contractors in Canada and upstate New York, respectively. By transferring the work of handling simpler LSR orders to those contractors in this unusual and unique situation, the Company permanently transferred jobs, which should have remained in the bargaining unit, to outside contractors who were non-signatories to the Agreement, thereby violating the Agreement.
>
> This holding is limited to its facts and does not create a blanket prohibition of all contracting out. Rather, it stands for the narrower proposition that the transfer of

>work to outside entities under the unique and unusual facts present in this case was a prohibited permanent transfer of IBEW jobs.

(Id. at 38-39.)

## III. DISCUSSION

Fairpoint asks the Court to vacate the Arbitration Award because the Arbitration Panel exceeded its authority. In the Court's assessment, however, the Arbitration Panel did not exceed its authority. Instead, the Arbitration Panel reasonably interpreted the provisions in the CBA in light of the unique circumstances presented. Fairpoint advances three challenges to the arbitration award.

First, Fairpoint argues that the Arbitration Panel exceeded its authority when it found that the Transfer of Jobs provision prohibited Fairpoint "from permanently transferring jobs from [the Union] to Teletech and APAC[.]" (Arbitration Award at 38.) Fairpoint claims that this interpretation of the Transfer of Jobs provision places limits on Fairpoint's ability to subcontract sales work when in actuality "[t]he Transfer of Jobs [provision] by its terms is not a restriction on subcontracting since it refers to restrictions on the transfer of Union 'jobs' and not the subcontracting of 'work.'" (Opp'n To Def. And Pl. In Countercl.'s Mot. For J. On The Pleadings And For Attorneys' Fees And Costs And Mem. Of Law In Support Of Pl. And Def. In Countercl.'s Cross-Mot. For J. On The Pleadings (ECF No. 18) ("Fairpoint's Opposition") at 15.) Rather, as Fairpoint has repeatedly asserted, the Transfer of Jobs provision is intended to apply only to transfers between and among Fairpoint properties. (Fairpoint's Opposition at 5; Arbitration Award at 23.) Fairpoint points to other provisions in the CBA that explicitly detail Fairpoint's restrictions on its ability to subcontract work performed by its plant and accounting employees. (See, e.g., CBA, Memorandum of Agreement, Contract Work at Page ID #585.)

There are no similar provisions with regard to sales work and had the parties intended to limit Fairpoint's ability to subcontract its sales work, Fairpoint argues that they could have so stated.

Through this argument, Fairpoint urges only a different interpretation of the Transfer of Jobs provision than that found by the Arbitration Panel. Through this Court's narrow and deferential review, it is apparent that the Arbitration Panel considered the language of the Transfer of Jobs provision, the entirety of the CBA and the history of negotiations in reaching its interpretation and award. (See Arbitration Award at 27-31; see also id. at 29 ("We disagree with the Company that the bargaining history proves that the parties intended the words "any entity" to mean something other than what they say.").) Indeed, after reviewing the Transfer of Jobs provision, the CBA and the history of negotiations, the Arbitration Panel found that Fairpoint's "contention that the parties intended to prohibit only intra-company transfers [through the Transfer of Jobs provision] is untenable. The language of the 2008 MOA and the bargaining history indicate otherwise." (Id. at 32.) The Court finds this conclusion and the Arbitration Award to be a plausible interpretation of the Transfer of Jobs provision to the unique facts of this case. See Providence Journal Co., 271 F.3d at 20.

Fairpoint similarly argues that the Arbitration Panel failed to harmonize various provisions of the CBA with its interpretation of the Transfer of Jobs provision. That is not so. The Arbitration Panel explicitly considered the subcontracting provisions in other sections of the CBA while remaining within the boundaries of the current dispute. (See Arbitration Award at 31-32.) The Arbitration Panel explicitly stated that "[o]n their face, we see no inherent conflict between the 2008 MOA and the 'Plant' MOA and Article P9." (Id. at 31.) While Fairpoint may disagree with that conclusion, "[i]n labor arbitration, matters of contract interpretation are

8

typically for the arbitrator, not for a reviewing court." El Dorado Technical Servs., Inc., 961 F.2d at 319.

Second, Fairpoint claims that the Arbitration Award conflated "jobs" with "work" in the Transfer of Jobs provision by preserving Union "work" rather than protecting Union "jobs." Specifically, Fairpoint states that "jobs" and "work" are analytically distinct and yet the Arbitration Panel substituted "work" for "jobs" in the Transfer of Jobs provision.  Here again Fairpoint is merely urging a different interpretation of the contract language to the facts of this case.  That is not a basis for the Court to overturn an arbitration award.  See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987) (stating that "the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.")  Furthermore, the Arbitration Panel directly grappled with the meaning of the word "jobs."  (See Arbitration Award at 33 (stating that "this case has flushed out a latent ambiguity: the meaning of the word 'jobs.'")  The Court will not disturb the plausible finding that by transferring simpler LSR work, Fairpoint permanently transferred Union jobs as prohibited by the Transfer of Jobs provision.

Third, Fairpoint claims that no jobs could be "transferred" because those jobs never existed at the Union.  Indeed, Fairpoint argued to the Arbitration Panel as it does to the Court that no jobs were transferred from the bargaining unit because during the transition period the fallout work from the simpler LSR orders went directly from the Massachusetts and New York service centers to Teletech (and later to APAC).  Accordingly, Fairpoint argues that no jobs were transferred from the Union and in fact the number of Union jobs actually increased.  As the Arbitration Panel found, "[t]his straightforward argument has a great deal of surface appeal, but we are convinced that it does not account for what actually happened here."  (Arbitration Award

9

at 33.) Instead, the Arbitration Panel found that the Union acquired a legitimate claim to the jobs that went to Teletech. (Id.) After a lengthy analysis of the facts, the Arbitration Panel concluded that, the Union's "loss of simpler LSR work unquestionably resulted in a loss of jobs. The [Union] may be bigger than it was before Fairpoint took on the Wholesale business, but it is certainly smaller than it would have been had it retained all of the LSR work." (Id. at 37.) The Court finds that this is a plausible reading of the Transfer of Jobs provision in light of the circumstances of this case. See Salem Hosp., 449 F.3d at 238.

In short, the Court finds that the Arbitration Panel acted within the scope of its authority and plausibly, interpreted the Transfer of Jobs provision and the CBA, in light of the facts and circumstances presented. Fairpoint has failed to present any grounds for this Court to vacate the Arbitration Award. See Local 1445, United Food & Commercial Workers Int'l Union, AFL-CIO, 776 F.2d at 21.

### III. ATTORNEYS' FEES AND COSTS

Finally, the Union has moved for its reasonable attorneys' fees and costs in defending the Arbitration Award. (See ECF No. 14.) As grounds for this request, the Union argues that Fairpoint ignored the deferential standard of review in filing this lawsuit and burdened both the Union and the Court with this lawsuit when it should have simply complied with the Arbitration Award. To the extent it appears that the Union requests attorneys' fees and costs as a sanction for Fairpoint's presentation of legal contentions not warranted by existing law, any such request would be governed by Federal Rule of Civil Procedure 11. Fed. R. Civ. P. 11(b)(2). However, the Union did not cite Rule 11 or comply with its requirements. See Fed. R. Civ. P. 11(c)(2). Even if the Union had complied with the procedures outline in Rule 11, the Court in its discretion would deny to award fees and costs as a sanction on the record presented.

## IV.  CONCLUSION

For the reasons stated herein, the Court hereby DENIES Fairpoint's Motion (ECF No. 17).  The Court hereby GRANTS the Union's Motion For Judgment On The Pleadings but DENIES the Union's Motion For Attorneys' Fees And Costs. (ECF No. 14.)  In addition, the Court DENIES the Motion For Oral Argument (ECF No. 20).  As a result of these rulings, the Court CONFIRMS the March 23, 2012 Arbitration Award (ECF No. 16-6) and ORDERS that judgment be entered in favor of Defendant.

SO ORDERED.

/s/ George Z. Singal  
United States District Judge

Dated this 31st day of January, 2013.